# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| **BETTY HARRIS, as Personal Representative of the Estate of Wallace Wilder,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **7:21-cv-00608-LSC** |
| **v.** | ) ) | |
| **TODD HALL, *et al.*,** | ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF OPINION

Plaintiff Betty Harris, as the Personal Representative of the Estate of Wallace Wilder, brings this civil rights and wrongful death action against several law enforcement officers and other allegedly responsible parties. Most of the defendants have either settled or have been dismissed; only Plaintiff's claims against Defendants Michael Gilliam and Samuel Powell ("Defendants") remain pending. Before the Court are cross motions for summary judgment filed by Plaintiff and Defendants. (Docs. 105, 107.) The motions are fully briefed and are ripe for review. (*See* docs. 105, 107, 112, 113, 117, 118.) For the reasons stated below, Plaintiff's motion is due to be **DENIED**, and Defendants' motion is due to be **GRANTED**.

# I.   BACKGROUND[1][2]

On the morning of August 28, 2019, Wilder woke his neighbors by slamming doors in his apartment "so hard that it rattled [his neighbors'] bedroom wall." (Doc. 105-23 at 2.) The neighbors described hearing Wilder "screaming about someone breaking into his house and stealing his food." (*Id.*) One of the neighbors claimed she heard two voices coming from Wilder's apartment through a shared wall, and

---

[1]   The facts set out in this Opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record….").

[2]   Subject to a "few qualifications," Plaintiff concedes that Defendants' statement of facts is accurate. (Doc. 113 at 3.) As Defendants note, Plaintiff fails to support any objection she has to Defendants' statement of facts with record evidence. (*See id.* at 1–3.) Under this Court's Uniform Initial Order, Defendants' statement of facts is thus deemed admitted. (*See* doc. 6 at 16–17 ("Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*" (emphasis in original).) *Accord Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.") (citation omitted). Nevertheless, most of the facts material to the resolution of the present motions are established by Sergeant Cory Patterson's body camera footage, and in considering Defendants' motion this Court views the evidence in the light most favorable to Plaintiff. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213-14 (11th Cir. 2015); *but see Scott v. Harris*, 550 U.S. 372, 380–81 (2007) ("The Court of Appeals … should have viewed the facts in the light depicted by the videotape.").

that it sounded like Wilder was talking to another person. (Doc. 105-24.) Feeling "nervous" and "threatened" by Wilder's behavior, the neighbors called the police to report the disturbance. (Docs. 105-23 at 2; 105-24.) Wilder also called the police to report someone being at his apartment. (Doc. 105 ¶ 11.)

At around 5:05 p.m., Sergeant Cory Patterson arrived at Wilder's apartment in response to a disturbance call. (*Id.* ¶ 13.) After knocking on Wilder's door and announcing his presence, Patterson attempted to engage Wilder in conversation. (Doc. 107-3 at 0:15–50.) He informed Wilder that he was just there to check on him; Wilder responded that he was not going to open the door. (*Id.* at 1:19–29.) Over the course of the next half hour, Patterson tried several times to get Wilder to come out and talk, but each time, Wilder refused. (*See id.*)

Between attempts to convince Wilder to come out, Patterson talked to some neighbors, who expressed concern for Wilder's recent behavior. (*See id.* at 6:23–18:25.) The neighbor who made the disturbance call told Patterson that Wilder had not physically threatened the neighbor, but that Wilder had previously been institutionalized after killing somebody with a hammer.[3] (*Id.* at 10:25–48.) He said that Wilder was "off his medicine," and that his behavior had "gotten so bad" that the neighbor was "concerned about [his] family." (*Id.* at 8:52–9:13.) He expressed

---

[3] Plaintiff explains that Wilder suffered from paranoid schizophrenia, and in 1988 he was hospitalized after being acquitted of murder by reason of mental disease or defect. (Doc. 20 ¶ 16.)

his opinion to Patterson that "somebody has got to do something before something happens that can't be taken back." (*Id.* at 9:40–46.)

At around 5:38 p.m., Gordo Chief of Police Johnny Stephenson arrived at the scene and called for additional officers to come assist. (*Id.* at 32:55; doc. 105 ¶ 16.) Seven other law enforcement officers, including Powell and Gilliam, responded. (*Id.* ¶ 18.) Stephenson and another officer told Powell that "there was a barricaded subject" and that Wilder had reported a break-in that morning, leading Powell to believe there was possibly another person in Wilder's apartment. (Doc. 105-27 at 2.) Gilliam was likewise told that "there was a barricaded subject and that there was potentially another individual in the apartment." (Doc. 105-27 at 2.)

Chief Stephenson, who was familiar with Wilder's history of mental illness, formed a plan to "convince [Wilder] to go to the hospital" and get help, as he had done in the past. (Doc. 105 ¶¶ 3, 17; doc. 107 ¶¶ 2, 10.) That plan involved having Powell distract Wilder at a side window while other officers attempted to forcibly enter his apartment through the front door. (Doc. 105 ¶ 19.) It also involved calling an ambulance to transport Wilder to the hospital, which one of the officers did before they attempted entry. (Doc. 107-3 at 47:30–36.)

At about 5:57 p.m., Chief Stephenson attempted to enter Wilder's apartment using a key provided by a maintenance man who worked at the apartment complex.

(*Id.* at 22:20-27, 52:10.) After the key failed to unlock the door, Patterson kicked the door open, saw Wilder, and said, "Oh, he's got a knife, he's got a knife, he's got a knife!" (*Id.* at 52:12–18.) Wilder slammed the door shut. (*Id.*) Patterson kicked the door open a second time and deployed his taser at Wilder. (*Id.* at 52:45–52.) The taser missed, and Wilder shut his door again. (Doc. 105 ¶¶ 22–23.) Stephenson opened the door a third time. (*Id.* ¶ 24.) One officer tried and failed to tase Wilder, and another officer apparently tased himself while attempting to tase Wilder. (*See id.*; doc. 107-3 at 52:55–53:12.) Wilder closed the door once more. (*Id.* at 53:05.)

An officer opened Wilder's door a fourth time and placed a bench in the opening to prevent the door from closing. (Doc. 105 ¶ 25.) Stephenson tried to convince Wilder to come out, but he refused. (Doc. 107-3 at 54:00–10.) Another officer ordered Wilder to drop his knife, to which he responded, "I ain't dropping shit." (*Id.* at 54:16–20.) Stephenson deployed a taser at Wilder, this time making contact. (Doc. 105 ¶ 29.) Wilder fell backward. (*Id.* ¶ 30.)

Several officers, including Powell, entered the apartment to subdue Wilder. (*Id.*) As they neared, Wilder stood up holding the knife. (*Id.* ¶ 31.) The officers tried to retreat, but two were blocked in by a table. (*Id.*) As Wilder advanced on those two officers with the knife, they shot him. (*Id.* ¶ 33.) An autopsy report indicates Wilder died that day from multiple gunshot wounds. (Doc. 105-18 at 1.)

Gilliam did not enter the apartment until the shots were fired. (*Id.* ¶ 34.) Neither Gilliam nor Powell discharged any weapon during this entire encounter. (*Id.* ¶ 35.) Nevertheless, Plaintiff claims they are responsible for Wilder's death.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal*

*Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213-14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (*per curiam*) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.  DISCUSSION

Plaintiff alleges several constitutional violations under 42 U.S.C. § 1983 and wrongful death claims under Alabama law. Although Plaintiff's claims and theories of liability are varied, they all are based on Defendants' failure to intervene in the

warrantless entry into Wilder's home and his subsequent seizure by other officers. Defendants insist they did not violate Wilder's constitutional rights, and even if they did, they are nonetheless entitled to qualified immunity from Plaintiff's § 1983 claims. As to Plaintiff's state-law claims, they assert state-agent immunity. This Court first outlines the principles of qualified immunity, then applies those principles to Plaintiff's § 1983 claims, and closes by addressing Defendants' immunity from the state-law claims.

### A. Qualified immunity shields Powell and Gilliam from § 1983 liability unless Plaintiff shows that they violated clearly established law.

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). It "allow[s] government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir. 2010) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'" *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).[4]

To overcome a qualified immunity defense, a plaintiff must satisfy a two-part test. *Id.* at 734. First, "the facts, construed as they must be … in the light most favorable to the plaintiff," must establish that the defendant violated a constitutional right. *Id.* Second, the plaintiff must show that the violated right was "clearly established" when it was violated. *Id.* "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 (2009)).

A right was clearly established when it was violated if "the state of the law gave the defendants fair warning that their alleged conduct was unconstitutional." *Washington v. Rivera*, 939 F.3d 1239, 1245 (11th Cir. 2019) (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003)). "Fair warning comes in the form of [materially similar] binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state ([Alabama], here) that makes it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal

---

[4]     To receive immunity, the government official ordinarily must first establish that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). But here, Plaintiff does not dispute that Defendants were acting within the scope of their discretionary authority at all times relevant to the complaint. (Docs. 113 at 6; 20 ¶¶ 8–9.)

law." *Jones v. Fransen*, 857 F.3d 843, 851–52 (11th Cir. 2017) (cleaned up) (citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 741).

The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *Id.* "This is because officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases, and an official's awareness of the existence of an abstract right does not equate to knowledge that his conduct infringes the right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019) (cleaned up) (quoting *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011)). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (cleaned up) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 194–95 (2001) (citation omitted). "If the law did not put the officer on notice that his conduct would be

clearly unlawful, summary judgment based on qualified immunity is appropriate."

*Id.*

**B. Plaintiff's deprivation of life claim is not cognizable under the Fourteenth Amendment (Count One).**

In Count One, Plaintiff asserts a deprivation of life claim under § 1983 and the due process clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law…."). This Count remains asserted against only Powell as this Court previously granted a motion by Gilliam to dismiss this Count. (Doc. 67.) Powell argues that he is entitled to summary judgment on this claim because it may only be properly asserted under the Fourth Amendment. This Court agrees, and Plaintiff acknowledges that this claim is duplicative of her Fourth Amendment claims. (*See* doc. 113 at 5.)

When a plaintiff asserts an excessive force claim under § 1983, the claim must "be judged by reference to the specific constitutional standard which governs that right." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Id.* at 395. The Supreme Court has explicitly held that "*all*

claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* (emphasis in original).

Accordingly, Powell is entitled to summary judgment on Count One.

### C. Defendants are not liable for failing to intervene in Chief Stephenson's plan to enter Wilder's home to conduct a welfare check (Count Five).

In Count Five, Plaintiff claims that Defendants violated Wilder's right to be free from unreasonable searches in failing to prevent the warrantless entry into Wilder's apartment. *See* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."). Defendants contend that exigent circumstances justified the warrantless entry into Wilder's apartment, and even if not, they had no duty to thwart Chief Stephenson's plan to enter the apartment. Relevant authority supports both of Defendants' contentions.

#### 1. *Exigent circumstances justified the entry into Wilder's apartment.*

The Fourth Amendment prohibits an officer's warrantless entry into a person's home, except in certain circumstances. *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (*per curiam*). One exception to the warrant requirement applies where "'exigent circumstances' mandate immediate action." *Id.* (quoting *United*

*States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)). The "exigent circumstances" exception applies "where officers reasonably believe a person is in danger." *Id.* In the context of a mental health welfare check, "the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others." *See id.* (citations omitted); *see also Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir.), *cert. dismissed*, 142 S. Ct. 2855 (2022) (requiring a "substantial chance" of "dangerous behavior"). "Probable cause does not require conclusive evidence and 'is not a high bar.'" *Washington v. Howard*, 25 F.4th 891, 899 (11th Cir. 2022) (quoting *D.C. v. Wesby*, 583 U.S. 48, 57 (2018)).

The Eleventh Circuit has concluded that an officer does not violate the Fourth Amendment in executing a warrantless entry for the purpose of conducting a welfare check on a person suspected of suffering a mental health crisis. *See Harrison v. Davidson Hotel Co., LLC*, 806 F. App'x 684 (11th Cir. 2020). The officers in *Harrison* responded to a call for a wellness check at a hotel. *Id.* at 685. When they arrived, they were told by hotel staff that the plaintiff had been claiming he owned the hotel and had been timing how long it took for room service orders to arrive. *Id.* at 685–86. One of the officers knocked on the plaintiff's door, announced he was a police officer, and asked the plaintiff to come speak with him. Instead of complying, the plaintiff asked the officers to bring him a drink and to clean his room. *Id.* at 686.

A neighboring guest told the officers that he had heard screaming and glass breaking, and that he did not feel safe in his room. *Id.* The officers decided to enter the room "for the safety of [the plaintiff] and anyone else inside." *Id.* Based on the plaintiff's erratic behavior, the court concluded that exigent circumstances justified the officers' entry into his room "because the officers reasonably believed his mental state made him a danger to himself." *See id.* at 688.

In a case strikingly similar to this one, the Supreme Court found "no doubt that the officers did not violate any federal right" when they entered the plaintiff's room without a warrant to conduct a welfare check. *See City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 612 (2015). There, officers responding to a call for a welfare check went to the plaintiff's room, knocked on her door, announced who they were, and told her that they wanted to help her. *Id.* at 604. When they entered using a key, the plaintiff grabbed a knife and yelled, "I am going to kill you. I don't need help. Get out." *Id.* The officers retreated and called for backup. *Id.* But because the officers believed the situation required their immediate attention, they chose to reenter instead of waiting for backup to arrive. *Id.* at 605. While one officer pushed the door open, the other officer used pepper spray to subdue the plaintiff. *Id.* Despite being pepper sprayed in the face, the plaintiff advanced on the officers and would not drop her knife. *Id.* at 605–06. Once she closed the distance to within a few feet, the

officers shot her multiple times. *Id.* at 606. The Court held unequivocally that the officers' conduct was not unconstitutional. *Id.* at 612.

Here, Sergeant Patterson responded to a disturbance call and, like the officers in *Harrison* and *Sheehan*, knocked on Wilder's door and announced his authority and intent to help. After Wilder repeatedly refused to come out or talk, Patterson talked to his neighbors. He learned that Wilder suffered from mental illness, was not taking his medication, had been acting erratically, and had previously been institutionalized after killing somebody. He also learned that there might be someone else in Wilder's apartment, and that neighbors were concerned for their safety.[5][6] Under these facts, the officers reasonably could have concluded that there was a "substantial chance" that Wilder would exhibit "dangerous behavior" toward himself or others. *See Ingram*, 30 F.4th at 1250. Thus, there is "no doubt that the officers did not violate

---

[5]   This Court briefly notes that the accuracy of this information is not relevant to the analysis, absent any evidence that Patterson or the other officers should have doubted it. *See Roberts*, 643 F.3d at 905 (finding no constitutional violation in a mental health search and seizure where there was "nothing in the record to suggest [the officer] should have doubted the information" given to him); *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) ("What counts ... is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later.").

[6]   Just before the officers attempted entry, Chief Stephenson can be heard on Patterson's body camera footage describing what sounds like a call that dispatch received earlier that day from Wilder threatening to kill his neighbors. (*See* doc. 107-3 at 49:10–25.) But because this particular evidence is somewhat ambiguous, and because Defendants failed to offer this fact as undisputed, the Court does not consider it in determining the existence of probable cause.

any federal right" when they entered Wilder's apartment without a warrant to conduct a welfare check. *See Sheehan*, 575 U.S. at 612.

To argue the contrary, Plaintiff relies on the testimony of her expert witness, who opined that the entry into Wilder's apartment was unlawful. This reliance is misplaced. *See Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018) ("[Q]uestions of law are not subject to expert testimony."); *United States v. Duldulao*, 87 F.4th 1239, 1269 (11th Cir. 2023) ("Rule 704 bars a witness from giving legal opinions (e.g., 'the defendant broke the law')….").

But even if the existence of probable cause supporting the initial breach of Wilder's door were in doubt, there is no question that exigent circumstances justified Powell's and Gilliam's entry. By the time Powell entered Wilder's apartment, he knew that (1) Wilder had a knife that he refused to drop; (2) Wilder was acting belligerently and not obeying orders; (3) another person potentially was in the apartment with Wilder; (4) an officer had been tased; and (5) Wilder had been tased. By the time Gilliam entered, Wilder had been shot. Clearly, by then, Defendants "reasonably believe[d] a person [was] in danger," thus giving them probable cause to enter lawfully without a warrant. *Roberts*, 643 F.3d at 905. Plaintiff appears to concede this point. (*See* doc. 113 at 3–4 ("If one were to view the incident only from

the time the officers broke into the apartment and were allegedly threatened by Wilder, qualified immunity would protect [Defendants]….").)

### 2. *Powell and Gilliam had no duty to intervene in the warrantless entry.*

Plaintiff claims that Defendants had a legal obligation to intervene and prevent the other officers' warrantless entry into Wilder's apartment. This claim necessarily fails in that, as explained above, the warrantless entry into Wilder's apartment was justified by exigent circumstances. But even assuming the initial entry into Wilder's apartment was unconstitutional, this claim still fails. Defendants had no duty to intervene because they had no reason to believe that they were participating in an unlawful search and seizure.

Plaintiff cites no cases holding that an officer violates the constitution by failing to intervene in a warrantless entry.[7] She does, however, cite binding authority holding that an officer may violate the constitution by failing to intervene in an unlawful arrest. *See Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013). Analogizing the rule pronounced in *Wilkerson* to the context of warrantless entries, an officer may be liable for failing to intervene in a warrantless entry if (1) the officer "sufficiently participated" in the entry; and (2) the officer "knew the [entry] lacked any constitutional basis and yet participated" anyway. *See id.*

---

[7]     This, of course, precludes Plaintiff's ability to satisfy her burden to show that the relevant law was clearly established, as necessary to overcome qualified immunity.

Given their minimal roles—Powell only knocked on Wilder's window while Gilliam merely was present—this Court is doubtful that they "sufficiently participated" in the warrantless entry. *See id.*; *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010) ("Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action."). But even "assuming that [Defendants] sufficiently participated in [the entry], [they] still lacked the requisite information to put [them] on notice that an unlawful [entry] was occurring or had occurred." *Wilkerson*, 736 F.3d at 980. When they responded to Chief Stephenson's call for backup, Defendants knew only what they were told by other officers, i.e., that there was a "barricaded subject" and possibly another person inside the apartment. Defendants were "entitled to rely" on this information and to "fill in any gaps … with reasonable inferences premised on [the other officers] acting in a constitutional manner and in good faith." *Id.* They had no duty to investigate the basis of Stephenson's plan to execute the warrantless entry. *Id.* (citing *Jones v. Cannon*, 174 F.3d 1271, 1284–86 (11th Cir. 1999)).

Thus, because Plaintiff can point to no evidence which would have "raise[d] any obvious concerns as to the existence of probable cause," Defendants cannot be held liable for failing to intervene in the warrantless entry. *See id.*; *cf. Hartsfield v.*

*Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995), *as amended* (June 14, 1995) (affirming summary judgment for officers where "nothing in the record indicate[d] that these officers acted unreasonably in following [another officer's] lead, or that they knew or should have known that their conduct might result in a violation of the [plaintiffs'] Fourth Amendment rights"); *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001) ("Each of these individuals acted at the order of a superior and the record reflects no reason why any of them should question the validity of that order. We, therefore, affirm the district court's grant of qualified immunity...."); *accord White v. Goforth*, No. 22-5409, 2023 WL 3546527, at *5 (6th Cir. May 18, 2023) ("[W]ithout knowledge of the underlying constitutional violation, [the defendant officer] cannot be liable for failing to stop it."); *Vela v. White*, 703 F.2d 147, 152 (5th Cir. 1983) (*per curiam*) ("Under the circumstances of this case, it would not be fair to force [the defendant officer] to either violate a direct order or else stop and interrogate [his superior] as to the reasons for his order, at the risk of being held liable for damages for an unlawful arrest.").

This result makes sense both logically and practically. As then-District Judge Brasher explained, there is a vast ocean of consequence between requiring an officer to intervene in an excessive use of force and requiring an officer to investigate the basis for another officer's arrest—or, in this case, warrantless entry:

It is one thing to require a police officer to stop his partner from hitting someone with a baton. It is another to require that every officer on the street actively inquire as to the constitutional merits and predicate of each seizure by other officers, and then countermand seizures they believe are unreasonable. It would effectively conscript every police officer to play the role of internal affairs as well as peacekeeper.

*Stallworth v. Hurst*, No. 2:18-CV-1005-ALB-SRW, 2019 WL 5070196, at *2 (M.D. Ala. Oct. 8, 2019) (Brasher, J.).

Accordingly, Defendants are entitled to summary judgment on Count Five.

### D. Defendants are not liable for failing to intervene in the other officers' use of force against Wilder (Counts Two and Three).

In Counts Two and Three, Plaintiff contends that law enforcement officers used excessive force when they tased and shot Wilder. Because Defendants did not themselves apply any force to Wilder, Plaintiff argues instead that they are liable for failing to intervene. She appears to advance two different theories in support of this argument. Both fail.

First, Plaintiff contends that, because the officers lacked a constitutional basis to enter Wilder's home, *any* use of force was necessarily excessive. This argument fails outright under the very opinion that Plaintiff cites as authority. *See Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000). *Jackson* confirms that "if a stop or arrest is illegal, then there is no basis for any threat or any use of force," and therefore any use of force would be presumptively excessive. *See id.* at 1171. But such a claim is viable only as an unlawful arrest claim, not as an excessive force claim. *Id.* ("Under

this Circuit's law, however, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."); *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006) (concluding that the plaintiff's excessive force claim "fail[ed] as a matter of law" because it was "entirely derivative of, and [] subsumed within, the unlawful arrest claim"). Moreover, even if this Court considered these claims discretely, they would fail: as explained above, there was no unlawful entry.

Second, to the extent Plaintiff argues that—assuming the entry was lawful—Defendants are liable for failing to intervene in the other officers' use of allegedly excessive force, her claims still fail. An officer can be held liable under § 1983 if he "had the opportunity to intervene in [another officer's] use of excessive force and [yet] failed to do so." *Priester*, 208 F.3d at 925. Here, Defendants argue that Plaintiff fails to establish either that the force used was excessive under the circumstances or that Defendants had the opportunity to intervene. This Court agrees.

Plaintiff offers no rebuttal to Defendants' argument that they had no opportunity to intervene in the other officers' use of force. The Court agrees with Defendants that there is no evidence to suggest they could have prevented Wilder from being shot in response to his advancing with a knife on the officers pinned by a table—Gilliam was not even in the room when the shots were fired. *Cf. Riley v.*

*Newton*, 94 F.3d 632, 635 (11th Cir. 1996). There is, however, some evidence that Defendants could have prevented Wilder from being tased. Various officers made several unsuccessful attempts to tase Wilder, the first of which occurred about one minute and forty-five seconds before he was successfully tased. A reasonable jury could conclude from this that Defendants could have anticipated and prevented the successful tasing of Wilder. *See Priester*, 208 F.3d at 924–25 (reversing where the district court granted qualified immunity based on evidence that the defendant officer had no opportunity to intervene in a police dog attack that "lasted for only 5 or 10 seconds," but where other evidence indicated that the attack might have lasted as long as two minutes). But this finding is inconsequential here because the use of tasers was not an excessive use of force under the circumstances. As such, there is no basis to hold Defendants liable for failing to intervene. *See Jackson*, 206 F.3d at 1174 ("Since Pinckney is entitled to qualified immunity on his use of deadly force, there is no derivative claim against Fields.").

   "A determination that an officer used excessive force requires careful attention to the facts and circumstances of each particular case while recognizing that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Ingram*, 30 F.4th at 1251 (cleaned up) (citing *Graham*, 490 U.S. at 396). The excessive force framework set forth in

*Graham*, which asks whether the degree of force used was reasonable under the circumstances, applies to mental health seizures "even though they do not involve a criminal arrest." *See id.* (cleaned up) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1157–58 (11th Cir. 2005)). The Eleventh Circuit has consistently held that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) (quoting *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008)). This was such a situation. *Cf. Zivojinovich*, 525 F.3d at 1071, 1073 (affirming summary judgment on an excessive force claim where an officer tased a belligerent suspect who was handcuffed and being led to a patrol car).

Rather than rebut Defendants' assertion that each use of force on Wilder was justified in the moment of its use, Plaintiff maintains that any use of force against Wilder was excessive because it could have been avoided had the officers simply left him alone. (*See* doc. 113 at 7–9.) Plaintiff again relies on the opinions of experts to reach this conclusion, and again that reliance is misplaced. The Supreme Court has held that "so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Sheehan*, 575 U.S. at 616–17 (cleaned up) (citation

omitted). Thus, "even if [Powell] and [Gilliam] misjudged the situation, [Plaintiff] cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Id.* at 615 (citation and quotation marks omitted); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) ("Our task is not to evaluate what the officers could or should have done in hindsight.").

Accordingly, Defendants are entitled to summary judgment on Counts Two and Three.

### E. Plaintiff fails to show that clearly established law gave Defendants fair warning that their conduct was unlawful (Counts Two, Three, and Five).

Even if Defendants violated Wilder's constitutional rights, they are nonetheless entitled to summary judgment unless Plaintiff shows they violated clearly established law. She makes no such showing.

Plaintiff cites no existing precedent placing the constitutional questions before this Court "beyond debate." *Mullenix*, 577 U.S. at 12. Instead, she plainly concedes that the question of Defendants' liability "is certainly debatable." (Doc. 113 at 8.) And although Plaintiff cites opinions arguably supporting her claims in the abstract, she offers no materially similar cases giving Defendants "fair warning that their alleged conduct was unconstitutional." *Washington*, 939 F.3d at 1245. Especially in the context of Fourth Amendment claims, this is insufficient to meet her burden to

overcome Defendants' entitlement to qualified immunity. *See Priester*, 208 F.3d at 927 ("In the context of Fourth Amendment excessive force claims, we have noted that generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity."). Rather than show the governing law to be clearly established, much of the authority Plaintiff cites refutes her claims instead.

Accordingly, Defendants are entitled to summary judgment on Counts Two, Three, and Five.

### F. State-agent immunity shields Defendants from Plaintiff's state-law claims (Counts Six and Seven).

Counts Six and Seven allege state-law wrongful death claims premised on the same theories of allegedly unconstitutional acts and omissions that this Court has rejected. For the same reasons that Plaintiff's § 1983 claims fail, so too her state-law claims fail.[8] Alternatively, Defendants are entitled to state-agent immunity.

---

[8] The Court notes that this may not be true in every case. But Defendants argue convincingly—citing relevant facts and applicable law—that it is true here. And Plaintiff fails to address these arguments in her response. Federal courts frequently treat a plaintiff's failure to respond to arguments supporting the dismissal of a claim as an abandonment of that claim. *See, e.g.*, *Whitehurst v. Harris*, No. 6:14-CV-01602-LSC, 2015 WL 71780, at *7 (N.D. Ala. Jan. 6, 2015) ("Refusing to acknowledge a contested claim in a response brief is a ground for dismissal." (citing *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325–26 (11th Cir. 2000) (noting that an appellant's "failure to brief and argue [an] issue during the proceedings before the district court is grounds for finding the issue abandoned"))); *Hamilton v. Southland*

Under Alabama law, law enforcement officers are immune from tort liability arising from discretionary acts performed in the line of duty. *Moore v. Crocker*, 852 So. 2d 89, 90 (Ala. 2002). State-agent immunity does not apply, however, where an officer "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* at 91 (emphasis omitted) (quoting *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)). The plaintiff bears the burden of showing that one of these exceptions applies. *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). Here, Plaintiff does not even attempt to show that one of these exceptions applies. (*See generally* doc. 113.) Thus, Defendants are immune from her state-law claims. *See id.*

Accordingly, Defendants are entitled to summary judgment on Counts Six and Seven.

## IV.   CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is due to be **GRANTED** and Plaintiff's motion for summary judgment is due to be **DENIED**. The Court will enter an Order consistent with this Opinion.

**DONE** AND **ORDERED** ON APRIL 8, 2024.

---

*Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it." (citing *Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir.2009) (*per curiam*))).

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

215647